IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INFRARED ENVIRONMENTAL INFRASTRUCTURE GP LIMITED, EUROPEAN INVESTMENTS (MORÓN) 1 LIMITED, EUROPEAN INVESTMENTS (MORÓN) 2 LIMITED, EUROPEAN INVESTMENTS (OLIVENZA) 1 LIMITED, and EUROPEAN INVESTMENTS (OLIVENZA) 2 LIMITED,<br><br>        Plaintiffs,<br><br>   v.<br><br>KINGDOM OF SPAIN,<br><br>        Defendant. | Civil Action No. 1:20-cv-00817-JDB<br><br>**Hon. John D. Bates**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF THE KINGDOM OF SPAIN'S
MOTION TO DISMISS THE COMPLAINT OR STAY THE PROCEEDING**

Ana C. Reyes (D.C. Bar No. 477354)
Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:     (202) 434-5000
Fax:     (202) 434-5029
Email:   areyes@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    The Parties .................................................................................. 3

    B.    The Applicable Legal Framework ........................................................ 3

        1.    The legal order of the European Union.................................... 3

        2.    The impermissibility of international arbitration by Member States concerning matters of EU law ................................................. 5

        3.    The European Commission's state-aid decision regarding Spain .............. 9

        4.    The Energy Charter Treaty ................................................... 11

    C.    The Arbitration.................................................................... 12

STANDARD OF REVIEW ........................................................................................ 13

ARGUMENT ........................................................................................................ 14

I.    THE COMPLAINT FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION.... 14

    A.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply. ................. 15

        1.    Under EU law, there was no agreement to arbitrate. ................................ 16

        2.    The EU's interpretation of its own law is binding on the Court. .............. 18

    B.    The "Waiver Exception" in Section 1605(a)(1) Does Not Apply. ....................... 20

II.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE. ......................................................................... 23

III.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT. ....................... 25

IV.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. ................................................. 26

V.    IN THE ALTERNATIVE, THE CASE SHOULD BE STAYED PENDING RESOLUTION OF THE ANNULMENT PROCEEDINGS............................................. 30

CONCLUSION...................................................................................................... 31

# TABLE OF AUTHORITIES

**European Union Cases**                                               **Page(s)**

\* *Achmea B.V. v. Slovak Republic*,
      CJEU Case No. C-284/16, ECLI:EU:C:2018:158 (6 Mar. 2018)................................... *passim*

\* *Achmea B.V. v. Slovak Republic*,
      German Federal Court of Justice *Case* No. 1 ZB 2/15 (31 Oct. 2018).............................6, 7, 8

*Anie v. Ministero dello Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA*,
      CJEU Case Nos. C-798/18 & C-799/18, ECLI:EU:C:2020:876 (29 Oct. 2020)................9, 17

*Budějovický Budvar v. Rudolf Ammersin GmbH*,
      CJEU Case No. C-478/07, ECLI:EU:C:2009:521 (8 Sept. 2009) ............................................4

*In re ECHR*,
      CJEU Opinion 2/13, ECLI:EU:C:2014:2454 (18 Dec. 2014) ..............................................4, 5


**International Treaties**

Convention on the Settlement of Investment Disputes between States
      and Nationals of Other States ("ICSID Convention") .................................................... *passim*

Energy Charter Treaty ("ECT")............................................................................................ *passim*

Treaty on European Union ("TEU")..........................................................................................3, 4

Treaty on the Functioning of the European Union ("TFEU") ...........................................10, 19, 26


**Federal Cases**

*9REN Holding S.A.R.L. v. Spain*,
      2020 WL 5816012 (D.D.C. Sept. 30, 2020) ..........................................................................31

*Air France v. Saks*,
      470 U.S. 392 (1985)................................................................................................................19

*Al Tech Specialty Steel Corp. v. United States*,
      28 Ct. Int'l Trade 1468 (C.I.T. 2004) ....................................................................................18

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
      138 S. Ct. 1865 (2018)............................................................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................14

*Atl. Tele-Network v. Inter-Am. Dev. Bank*,
  251 F. Supp. 2d 126 (D.D.C. 2003)...........................................................................27

*Balkan Energy Ltd. v. Republic of Ghana*,
  302 F. Supp. 3d 144 (D.D.C. 2018)...........................................................................15

*BCB Holdings Ltd. v. Belize*,
  650 F. App'x 17 (D.C. Cir. 2016)...............................................................................29

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012)....................................................................................30

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)................................................................................................23

*Chevron Corp. v. Republic of Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015)....................................................................................16

*Creighton Ltd. v. Gov't of State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999)....................................................................................21

*F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*,
  636 F.2d 1300 (D.C. Cir. 1980)..................................................................................23

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
  665 F.3d 384 (2d Cir. 2011)..................................................................................27, 28

*Foremost–McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990)....................................................................................21

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
  717 F.2d 602 (D.C. Cir. 1983)....................................................................................28

*Granite Rock Co. v. Teamsters*,
  561 U.S. 287 (2010)....................................................................................................25

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)...........................................................27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S.Ct. 524 (2019)...................................................................................................16

*In re Air Crash Over S. Indian Ocean*,
  352 F. Supp. 3d 19 (D.D.C. 2018)....................................................................26, 29, 30

*In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
  311 F.3d 488 (2d Cir. 2002)........................................................................................28

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987) ................................................................................................24

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001) ..................................................................................................28

*Irwin v. WWF, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006) ....................................................................................28

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) ........................................................................................................25

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ............................................................................................................30

*Mar. Int'l Nominees Estab. v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982) ........................................................................................25

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
    397 F. Supp. 3d 34 (D.D.C. 2019) ..............................................................................27, 31

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ............................................................................................................25

*Medellin v. Texas*,
    552 U.S. 491 (2008) ............................................................................................................18

*Micula v. Gov't of Romania*,
    104 F. Supp. 3d 42 (D.D.C. 2015) ..............................................................................11, 15

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017) ..................................................................................................15

*Nat'l R.R. Passenger Corp. v. B&M Corp.*,
    850 F.2d 756 (D.C. Cir. 1988) ..........................................................................................16

*Nemariam v. Fed. Democratic Republic of Ethiopia*,
    491 F.3d 470 (D.C. Cir. 2007) ..........................................................................................15

*Newco Ltd. v. Belize*,
    650 F. App'x 14 (D.C. Cir. 2016) ......................................................................................29

*NextEra Energy Glob. Holdings B.V. v. Spain*,
    2020 WL 5816238 (D.D.C. Sept. 30, 2020) ......................................................................31

*Nygard v. DiPaolo*, 753 F. App'x 716 (11th Cir. 2018) ..........................................................28

*Permanent Mission of India to the U.N. v. City of New York*,
    551 U.S. 193 (2007) ............................................................................................................15

*Phx. Consulting Inc. v. Republic of Angola*,
216 F.3d 36 (D.C. Cir. 2000) ................................................................23

*Pitney Bowes, Inc. v. U.S. Postal Serv.*,
27 F. Supp. 2d 15 (D.D.C. 1998) ..........................................................14

*Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82 (D.C. Cir. 2002) ................................................................30

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) ..............................................................................24

*Richards v. Duke Univ.*,
480 F. Supp. 2d 222 (D.D.C. 2007) ......................................................14

*Rong v. Liaoning Provincial Gov't*,
362 F. Supp. 2d 83 (D.D.C. 2005), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006) ..............................13

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993) ..............................................................................15

*Simon v. Republic of Hungary*,
911 F.3d 1172 (D.C. Cir. 2018) ............................................................30

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) ..............................................................................26

*Smith-Haynie v. District of Columbia*,
155 F.3d 575 (D.C. Cir. 1998) ..............................................................14

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ..............................................................................25

*Sumitomo Shoji Am., Inc. v. Avagliano*,
457 U.S. 176 (1982) ..............................................................................18

*Tatneft v. Ukraine*,
301 F. Supp. 3d 175 (D.D.C. 2018) .................................................22, 23

*Tatneft v. Ukraine*,
771 Fed. App'x 9 (D.C. Cir. 2018) ..................................................22, 23

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
411 F.3d 296 (D.C. Cir. 2005) ....................................................28, 29, 30

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*,
455 U.S. 691 (1982) ..............................................................................25

*Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*,
38 F. App'x 4 (D.C. Cir. 2002) ...................................................................................... 14

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*,
493 U.S. 400 (1990) .......................................................................................................... 24

*World Wide Minerals, LTD v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ...................................................................................... 20

**Constitutional Provisions, Statutes, and Rules**

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 ............................................. *passim*

ICSID Convention Implementing Statute, 22 U.S.C. § 1650a ....................... 2, 15, 22, 26

Federal Rule of Civil Procedure 12(b)(1) ........................................................... 13

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 14, 22

U.S. Const., Art. I, § 10, cl. 3 ............................................................................. 18

## INTRODUCTION

With their Complaint, five European companies have traveled far abroad to the courts of the United States in an attempt to enforce an arbitral award about a European dispute against a European sovereign.  Plaintiffs came here for a simple reason:  If they had sought to enforce their award in any of the courts of the European Union—all of which are available fora for this case—those courts would have rejected their efforts under well-settled law.  Plaintiffs know this well because those courts have already rejected similar efforts by other arbitral claimants.  This case therefore presents a straightforward question:  whether Plaintiffs can use the courts of the United States to avoid decisions of European courts about European law as applied to European disputes.  Under principles of sovereign immunity and international comity, they cannot.

The Complaint fails for at least four reasons.  *First*, the Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  The Kingdom of Spain is presumptively immune to the jurisdiction of U.S. courts, and none of the exceptions to the FSIA applies because there was no agreement to arbitrate.  Plaintiffs sought to initiate arbitration by accepting a purported offer to arbitrate in the Energy Charter Treaty ("ECT"), a multilateral investment treaty among fifty-three contracting parties, including Spain, a majority of the Member States of the European Union ("EU"), and the EU itself.  But as the EU and its Member States have long maintained—since well before Plaintiffs brought their claims—the ECT's arbitration provision does not extend to disputes between Member States.  Instead, those disputes must be heard in court.

Plaintiffs thus proceeded at their own risk when they chose to pursue arbitration—if the Member States were right about the ECT's arbitration provisions, any resulting award would be invalid and unenforceable.  That risk materialized:  In the seminal *Achmea* decision, the EU's highest court, the Court of Justice, held that such arbitration provisions are incompatible with EU law and void *ab initio*.  In other words, under binding EU law, the ECT does not contain a valid

offer to arbitrate on the part of Spain.  That means there was no offer for Plaintiffs to accept and no agreement to arbitrate.  As a result, the Award is unenforceable and Spain is immune to the Court's jurisdiction.  *See* **Part I**.

*Second*, granting the Complaint would violate the foreign sovereign compulsion doctrine. Under EU law, payment of the award is unlawful because it would (i) constitute state aid that has not been approved by the European Commission and which Spain is therefore prohibited from paying; and (ii) compel Spain to violate a decision of the Court of Justice.  Comity requires that U.S. courts not take action that would cause the violation of another nation's laws.  *See* **Part II**.

*Third*, the Complaint should be denied because the Award is not entitled to "full faith and credit."  22 U.S.C. § 1650a(a).  An arbitral award is entitled to full faith and credit only if it would be recognized as "a final judgment of a court of general jurisdiction of one of the several States."  *Id.*  But federal courts decline to enforce judgments where, as here, the tribunal or court lacked jurisdiction.  The Tribunal lacked jurisdiction over Spain because there was no agreement to arbitrate, and it lacked subject-matter jurisdiction to issue an award of unlawful state aid.  The Award, issued over Spain's jurisdictional objections, is therefore unenforceable.  *See* **Part III**.

*Fourth*, if there were any question about the EU law above (Spain submits there is none), the Court should dismiss the Complaint under the doctrine of *forum non conveniens*.  Resolving any dispute would require the Court to wade into complex matters of EU law and the ECT, a treaty to which the United States is not party.  Granting the Complaint would require this Court to offer an interpretation of EU law contrary to that of the EU Court of Justice, undermining that sister court, violating principles of international comity, and inviting an ever-increasing flood of enterprising petitioners into this District.  The Court should decline that invitation.  *See* **Part IV**.

In the alternative, the Court should at a minimum stay this case until Spain's pending application to annul the Award is resolved by the ICSID *ad hoc* committee.  *See* **Part V**.

## BACKGROUND

This enforcement action arises out of an investment arbitration initiated by Plaintiffs against the Kingdom of Spain in June 2015, alleging various violations of the Energy Charter Treaty. That proceeding was administered by the International Centre for the Settlement of Investment Disputes ("ICSID") and registered as Case No. ARB/14/12. The Tribunal issued an Award on August 2, 2019. *See* ECF No. 3-1 (the "Award"). Spain filed an application under the ICSID Rules to annul the Award on December 5, 2019. That annulment proceeding remains pending. Plaintiffs filed this action on March 25, 2020.

### A.  The Parties

Defendant is the Kingdom of Spain, a foreign sovereign and a Member State of the European Union. Compl. ¶ 6. Plaintiffs are InfraRed Environmental Infrastructure GP Limited, European Investments (Morón) 1 Limited, European Investments (Morón) 2, European Investments (Olivenza) 1, and European Investments (Olivenza) 2 Limited (collectively "Plaintiffs"). *Id.* ¶¶ 2, 3. Plaintiffs are all entities established under the laws of the United Kingdom, *id.*, which was a Member State of the European Union at all times relevant to this dispute. Award ¶ 199. Collectively, Plaintiffs represent a European investment fund that invested in energy projects in Spain. *Id.* ¶ 8.

### B.  The Applicable Legal Framework

#### 1.  The legal order of the European Union

Spain is one of the twenty-seven Member States of the European Union ("EU"). Decl. of Prof. Steffen Hindelang ("Hindelang Decl.") (Dec. 18, 2020) ¶ 24.[1] The EU's foundational instruments are the Treaty on European Union (the "TEU," Hindelang Decl. Ex. 8) and the

---

[1]  Steffen Hindelang is a Professor at the University of Southern Denmark, where he specializes in EU and public international law. He has written extensively on the relationship between EU law and international investment treaties. His resume is attached to his declaration as Exhibit 1.

Treaty on the Functioning of the European Union (the "TFEU," Hindelang Decl. Ex. 9).[2]  *Id.*

The EU is comprised of several branches of government.  These include the European Council,

which defines the EU's overall political direction and priorities; the European Parliament, which

enacts legislation; the European Commission, which "oversee[s] the application of Union law

under the control of the Court of Justice of the European Union"; and the EU Court of Justice,

which is the final authority on issues of EU law.  *See* TEU, Arts. 14(1), 15(1), 17(1), 19.

 EU law applies throughout the EU and within each Member State.  By joining the EU,

each Member State agreed that EU law takes precedence and overrides any conflicting domestic

law, rule, or governmental action.  This principle of primacy is fundamental to the legal order

within the Europe Union.  Hindelang Decl. ¶¶ 29, 40–46.

 EU law also trumps incompatible rules of law that EU Member States may have

purported to create, including in international agreements or treaties concluded among them.

Hindelang Decl. ¶ 40.  The EU Court of Justice has held that, as a matter of the Member States'

delegation of sovereignty and the primacy of the EU Treaties, "an international agreement cannot

affect the allocation of power fixed by the EU [Treaties] or, consequently, the autonomy of the

EU legal system."  *In re ECHR*, CJEU Op. 2/13 ¶ 201 (Hindelang Decl. Ex. 21).  Thus, treaty

provisions that "concern two Member States . . . cannot apply in the relations between those

States if they are found to be contrary to the rules of the [EU Treaties]."  *Budějovický Budvar*,

CJEU Case No. C-478/07, ¶ 98 (Hindelang Decl. Ex. 16).

 The EU Court of Justice is the supreme judicial authority on EU law.  Hindelang Decl.

¶ 32.  It has exclusive jurisdiction to determine the content, scope, and application of the EU's

foundational documents.  *Id.*  It is composed of twenty-seven judges, one from each Member

---

[2]  European legal authorities and similar materials cited in this Memorandum of Law are attached
to the Hindelang Declaration, along with an index of exhibits that follows his signature page.

State.  TFEU, Art. 253.  The EU Treaties oblige the Member States to support the jurisdiction of the EU Court of Justice and require they do nothing to circumvent or hamper its authority.

The EU Treaties implement a regime to ensure the Court of Justice alone is empowered to interpret EU law.  *See* Hindelang Decl. ¶ 32.  This principle of autonomy is fundamental to the legal order of the European Union, and the EU Treaties protect that principle in two ways.  *First*, Article 267 of the TFEU requires that the highest national court of each Member State "shall" refer questions on EU law to the EU Court of Justice for a preliminary ruling.  The EU Court of Justice's decision is "binding on the national court," which is further "required to do everything necessary to ensure that that interpretation of EU law is applied."  *Puligienica Facility*, CJEU Case No. C-689/13, ¶¶ 37–38, 42 (Hindelang Decl. Ex. 25).  *Second*, Article 344 of the TFEU forbids EU Member States from submitting "a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than" their national courts.  As a result, EU Member States lack authority to establish dispute-resolution bodies, including arbitral tribunals that might be called upon to interpret or apply EU law outside the EU judicial system.  *In re ECHR*, CJEU Op. 2/13 ¶¶ 212–13; *see* Hindelang Decl. ¶ 35.

### 2.    The impermissibility of international arbitration by Member States concerning matters of EU law.

Consistent with these foundational principles of delegated sovereignty under the EU Treaties, the EU Court of Justice, the European Commission, and the European Union itself have consistently opined that Member States may not offer or submit to arbitration that may touch upon matters of EU law.

          a.       **The ruling of the Court of Justice in** *Achmea v. Slovak Republic*

In 2018, the EU Court of Justice issued a seminal decision in *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, (Hindelang Decl. Ex. 4), which addresses the ability of Member States to submit disputes to international arbitration.

*Achmea* concerned an investment arbitration between the Slovak Republic and a Dutch claimant.  The investor initiated proceedings under the dispute-resolution mechanism in a bilateral investment treaty ("BIT") between the Netherlands and the Slovak Republic, by which each state made a standing offer to arbitrate disputes with investors of the other state.  *Achmea* ¶ 6.  The treaty was signed in 1991.  On May 1, 2004, the Slovak Republic became a member of the EU, thereby ceding sovereignty to the EU and binding itself to comply fully with EU law. *Id.*  In 2008, the Dutch company initiated arbitration under the BIT.  *Id.* ¶ 9.  The Slovak Republic objected to the tribunal's jurisdiction, arguing that its accession to the EU rendered the arbitration clause invalid and unenforceable.  *Id.* ¶¶ 11, 14.  The tribunal disagreed, exercised jurisdiction in the case, and eventually rendered an award in favor of the investor.  *Id.* ¶ 12.

The Slovak Republic moved to set aside the award at the arbitral seat in Germany, arguing that the treaty's dispute-resolution mechanism was invalid under EU law and therefore could not be exercised by the national of another EU Member State.  Recognizing that the case presented a question of EU law, the German court referred the case to the EU Court of Justice for a preliminary determination.  The Court of Justice assigned the case to its Grand Chamber for hearing[3] and received submissions from the parties, the European Commission, and sixteen EU Member States.

---

[3]  The EU Court of Justice ordinarily sits in panels of three or five judges.  Significant cases are assigned to a Grand Chamber of fifteen judges, including the Court's President and Vice President.  *See Achmea* ¶ 14; Statute of the Court of Justice, Art. 16 (Hindelang Decl. Ex 13).

After deliberation, the Court issued a unanimous opinion:  The EU Treaties "preclud[e] a provision in an international agreement concluded between Member States, such as Article 8 of the [applicable bilateral investment treaty], under which an investor from one of those Member States may . . . bring proceedings against [another] Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."  *Achmea* ¶ 62.  The Court of Justice's reasoning is straightforward:  Under the EU Treaties, Member States lack authority to submit disputes that may require the interpretation of EU law to adjudication outside the judicial system of the European Union (e.g., to arbitral tribunals).  Thus, any putative offer to arbitrate such disputes was void *ab initio*.  Hindelang Decl. ¶ 52.

On remand, the German Federal Court of Justice was presented with the same question as this Court:  whether the arbitral award was enforceable following *Achmea*.  *See* Hindelang Decl. ¶ 53.  Under German law, an arbitral award will not be enforced if "the arbitration agreement is not valid" or "absen[t]" under the applicable law.  *Achmea*, Case No. I ZB 2/15, ¶ 15 (Nov. 8, 2018) (Hindelang Decl. Ex. 5).  The German court observed that the claimant attempted to create an arbitration agreement through Article 8 of the BIT, which appears to "contain[] an offer by the contracting states to conclude arbitration agreements with investors" of the other state.  *Id.* ¶ 17.  But under EU law, the Slovak Republic lacked the ability to make a legally binding offer to arbitrate:  "by acceding to the [European] Union, the member states have restricted their international powers . . . and have waived among themselves the exercise of international contractual rights that conflict with Union law."  *Id.* ¶ 41.  *Achmea* held that the BIT's arbitration conflicts with EU law.  Thus, the German court held that "[*t*]*here is therefore no offer* to conclude an arbitration agreement" in the BIT.  *Id.* ¶ 28 (emphasis added).  And because there was no valid offer for the claimant to accept, "*there is no arbitration agreement* in the relationship between the parties."  *Id.* ¶ 14 (emphasis added).

The German court held that the award was unenforceable and dismissed the case.

          **b.**        **The view of the European Commission and European Union**

The holding of the EU Court of Justice echoes the long-held position of the European Commission, which has "consistently taken the view that intra-EU BITs . . . are contrary to Union law since they are incompatible with provisions of the Union Treaties and should therefore be considered invalid." European Commission Decision 2015/1470 ¶ 102 (Mar. 30, 2015) ("State Aid Decision 2015/1470") (Hindelang Decl. Ex. 56). As early as 2006, the EU and several Member States objected that arbitral tribunals lack jurisdiction to hear claims by nationals of EU Member States against other Member States, insofar as those claims address matters of EU law. *See, e.g.*, *Eastern Sugar B.V. v Czech Republic*, SCC Case No 088/2004, Partial Award (Mar. 27, 2007) at ¶ 119 (Hindelang Decl. Ex. 3); Hindelang Decl. ¶ 16 & n.1.

Following *Achmea*, the European Commission formally notified the European Parliament and the European Council of the Court of Justice's holding, explaining that investors governed by EU law "cannot have recourse to arbitration tribunals established" under investment treaties, including "under the Energy Charter Treaty." *Communication from the Commission to the European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547 (July 19, 2018) ("EC Communication 547") at 26 (Hindelang Decl. Ex. 49).

The European Union, too, has affirmed that *Achmea* means that "as between EU Member States, Article 26 of the ECT is inapplicable . . . and therefore cannot have given rise to a valid arbitration agreement." Amicus Brief of the European Union, ECF No. 30-1 at 20, *Novenergia II – Energy & Environment (SCA) EU v. Kingdom of Spain*, Civ. No. 18-1148 (D.D.C. Sept. 24, 2019) (Hindelang Decl. Ex. 50) at 20. And just last fall, one of the Advocate Generals of the EU Court of Justice issued an opinion in which he confirmed that the dispute-resolution provision of the ECT is inapplicable to disputes between a Member State and nationals of another Member

State.  Opinion of Advocate General Saugmandsgaard Øe, *Anie*, CJEU Case Nos. C-798/18 &
C-799/18 ¶ 93 n.55 (Hindelang Decl. Ex. 67).

<strong>c.        The position of the EU Member States</strong>

Consistent with the Commission's view, nearly all EU Member States, including Spain,
have since confirmed their understanding of the EU Treaties—i.e., that an arbitration agreement
cannot be formed under multilateral treaties like the ECT that apply between an EU Member
State and a national of another Member State.  On January 15, 2019, twenty-two EU Member
States, including Spain and the United Kingdom, jointly declared that pursuant to *Achmea* an
"arbitral tribunal established on the basis of investor-State arbitration clauses" in bilateral
investment treaties between EU Member States "lacks jurisdiction, due to a lack of a valid offer
to arbitrate."  *Declaration of the Representatives of the Governments of the Member States on the
Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment
Protection in the European Union* (Jan. 15, 2019) (the "Joint Declaration") at 1 (Hindelang Decl.
Ex. 6).  This declaration was made specifically inclusive of the ECT, under which Plaintiffs
initiated the underlying proceedings in this case:  "For the Energy Charter Treaty, its systemic
interpretation in conformity with the [EU] Treaties precludes intra-EU investor-State
arbitration."  *Id*. at 2 n.2.

<strong>3.        The European Commission's state-aid decision regarding Spain</strong>

Arbitration between Member States and investors of other Member States cannot be
enforced for a second reason:  Paying the award constitutes unlawful state aid under EU law.

The EU Treaties prohibit Member States from granting subsidies to private actors—
referred to as "state aid"—that "might disrupt or threaten to distort competition" in any economic
sector.  Hindelang Decl. ¶ 70.  The European Commission has the sole authority to permit an EU

9

Member State to pay such subsidies, and it alone is empowered to review and evaluate such measures to determine their legality under EU law.

On November 10, 2017, the European Commission issued a binding decision regarding Spain's regulatory scheme for providing support in the electricity sector. *See* Decision 2017/7384 (Nov. 10, 2017) ("State Aid Decision 2017/7384") (Hindelang Decl. Ex. 55). That decision was the result of an independent proceeding commenced on December 22, 2014 by the European Commission regarding Spain's renewable energy policy, in which interested parties, including investors like Plaintiffs and a trade association representing renewable energy producers, made written submissions. *See id.* ¶ 1.

The European Commission's decision highlights two aspects of EU law that are relevant here. *First*, it determined that the subsidies for renewable energy production—the ones that formed the basis of Plaintiffs' claim in the underlying arbitration—"constitute State aid within the meaning of Article 107(1) TFEU." *Id.* ¶ 88. It also determined that Spain's implementation of the subsidy regime, in part because it benefited investors like Plaintiffs, was "in breach of Article 108(3) TFEU," which governs "all systems of aid existing in [the Member] States." *Id.* at 34; *see also id.* ¶ 89 ("The aid granted until the adoption of this decision is unlawful aid").

*Second*, observing that investors were bringing claims against Spain under the ECT, the Commission explained that "any compensation which an Arbitration Tribunal were to grant to an investor" in respect of the subsidies that were the subject of Spain's regulatory reforms in the energy sector "would constitute in and of itself State aid." *Id.* ¶ 165. As a result, Spain, as an EU Member State, cannot pay any such award without the European Commission's prior review and authorization. To dispel any possible misunderstanding on the issue, the European Commission explained that its decision "is part of Union law" and therefore "binding on Arbitration Tribunals, where they apply Union law." *Id.* ¶ 166. The decision is also binding on

private parties, like Plaintiffs, who are subject to enforcement actions by the European Commission if they receive unlawful state aid.

Courts in the European Union decline to enforce arbitral awards when, as here, doing so would violate State-aid laws. For example, the Swedish claimants in the *Micula* arbitration sought to enforce an ICSID award against Romania in the courts of Luxembourg, Sweden, and Belgium. Hindelang Decl. ¶ 77. "The Brussels Court of Appeal stayed the enforcement of the award and referred questions on the lawfulness of its enforceability under the EU law to the EU Court of Justice." *Id.* "[T]he Luxembourg Court of Appeal and the Swedish Nacka District Court refused to enforce the award because to do so would violate EU law on State aid." *Id.* None of the courts was willing to enforce the awards in violation of EU law.

### 4.    The Energy Charter Treaty

The Energy Charter Treaty ("ECT") is a multilateral investment treaty among fifty-three contracting parties, including Spain, the EU and many of its Member States, and certain Eurasian states. *See* Hindelang Decl. ¶ 14. The United States is not a signatory. The ECT provides for resolution of disputes through arbitration under various arbitral rules, including those set forth in the ICSID Convention. ECT, Art. 26(2)(c) & (4)(a).

Arbitral tribunals constituted under the ICSID Convention are required to "decide a dispute in accordance with such rules of law as may be agreed by the parties." ICSID Convention, Art. 42(1). As applied to this case, the contracting parties agreed that the Tribunal would decide the dispute in accordance with the ECT "and applicable rules and principles of international law," including EU law. ECT, Art. 26(6).

### C.       The Arbitration

On May 8, 2014, Plaintiffs commenced arbitration against Spain, purportedly invoking the dispute-resolution provision under Article 26 of the Energy Charter Treaty.  Award ¶ 96.  A three-member arbitral tribunal was constituted on November 26, 2014.  *Id.* ¶ 103.

Plaintiffs' claims arose from their investment in Spain's energy sector.  The merits of the dispute center on Spain's right to create, regulate, and modify subsidies for renewable-energy producers operating in Spain.  For many years, Spain has supported the development of renewable-energy production in accordance with its own national interests, its international commitments, and the EU's commitment to producing clean energy and reducing greenhouse gases.  Award ¶¶ 14–56.  To further these objectives, Spain enacted legislation that created a special incentive regime to encourage the production of renewable energy.  *Id*. ¶ 4.  Subsequently, and in parallel with the international financial crisis that began in 2008, Spain adopted new legislation to address unsustainable growth in the tariff deficit, which resulted from the special subsidized regime and a drop in demand for electricity, among other factors.  *Id*. ¶ 8.  Plaintiffs claimed these energy-sector reforms negatively affected their investments in Spain and violated several provisions of the ECT.  *Id*. ¶ 9.

From the outset of the arbitration, Spain objected to the tribunal's jurisdiction on the ground that the arbitration provision of Article 26 of the ECT does not apply to disputes between an EU Member State and investors of another EU Member State (i.e., "intra EU-disputes").  Award ¶ 199.  Spain explained that the proper process for resolving these intra-EU disputes was to seek relief before a court or tribunal that is a part of the EU's judicial system, which would ensure final recourse to the EU Court of Justice and compliance with EU Treaties.  *Id*. ¶ 208.  And, indeed, the courts of the Member States are available fora for resolving Plaintiffs' claims.  *See* Hindelang Decl. ¶¶ 59, 60.  The European Commission twice sought leave to intervene in the

arbitration, as provided for in the ICSID Arbitration Rules, and to file an *amicus curiae* brief on the question of the Tribunal's jurisdiction over intra-EU disputes.  Award ¶ 188–198.  The Tribunal rejected the first application, imposed cost barriers on the second, and ultimately declined to consider the European Commission's position.  *Id*.

The Tribunal issued Award on August 2, 2019.  The Tribunal found that Spain violated certain obligations under the ECT by modifying the subsidy scheme and frustrating Plaintiffs' legitimate expectations regarding the profitability of their investment.  Award at 166.  The Tribunal ordered Spain to pay EUR 28.2 million plus interest, along with certain sums for the cost of the proceeding.  *Id*.

Under Article 52 of the ICSID Convention, Spain had the right to seek annulment of the Award before an ICSID *ad hoc* Annulment Committee within 120 days of the date of the Award.  It did so on December 5, 2019.  *See* Compl. ¶ 27 n.5.  The Annulment Committee is empowered to annul the Award, in whole or in part, on various grounds, including that the tribunal "was not properly constituted" or "manifestly exceeded its powers."  ICSID Convention, Art. 52(1)(a)–(b), (e).  The annulment proceeding remains pending.

Rather than seeking to enforce the Award against Spain in Europe, the most natural place for enforcement against a European sovereign, Plaintiffs sought relief from this Court on March 25, 2020.  ECF No. 1.

## STANDARD OF REVIEW

Spain moves to dismiss the Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  When ascertaining jurisdiction under Rule 12(b)(1), "a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case."  *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (collecting cases), *aff'd*, 452

F.3d 883 (D.C. Cir. 2006).  "Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction" and "no presumption of truthfulness applies to the factual allegations" in the Complaint.  *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231–32 (D.D.C. 2007) (internal quotation marks omitted).  "The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Spain also raises the affirmative defense of foreign sovereign compulsion under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12(b)(6), the Court must accept well-pleaded allegations in the Complaint as true, but need not accept asserted inferences or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may also consider documents that are "referred to in the complaint" or are "central to plaintiff's claim."  *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (considering materials produced and pleadings submitted in underlying administrative proceeding), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).  The Court may grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense "when the facts that give rise to the defense are clear from the face of the complaint."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

## ARGUMENT

## I. THE COMPLAINT FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION.

This action should be dismissed for lack of subject-matter jurisdiction.  As a sovereign state, Spain is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), which provides the sole basis for obtaining jurisdiction over a foreign state in federal court.  *See*

14

*Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 197 (2007).[4]  Under

the FSIA, a foreign state is "presumptively immune from the jurisdiction of United States

courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

The FSIA specifies certain exceptions, but "[i]n the absence of an applicable exception,

the foreign sovereign's immunity is complete—[t]he district court lacks subject matter

jurisdiction over the plaintiff's case."  *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491

F.3d 470, 474 (D.C. Cir. 2007) (alterations in original) (internal quotation marks omitted).

"Because 'subject matter jurisdiction in any such action depends on the existence of one of the

specified exceptions to foreign sovereign immunity' laid out in the FSIA, as a 'threshold' matter

in every action against a foreign state, a district court 'must satisfy itself that one of the

exceptions applies.'"  *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 150–51

(D.D.C. 2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983)).

### A.      The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply.

The arbitration exception provides that a foreign sovereign is not immune to jurisdiction

in an action to enforce "an award made pursuant to [ ] an agreement to arbitrate . . . governed by

a treaty or other international agreement in force for the United States calling for the recognition

and enforcement of arbitral awards[.]"  28 U.S.C. § 1605(a)(6).  The exception does not apply

because there was no agreement to arbitrate.

Where parties "'disagree as to whether they ever entered into any arbitration agreement at

all, the court must resolve that dispute'" on its own accord and without reliance on the underlying

decision of the tribunal because "if there was never an agreement to arbitrate, there is no authority

---

[4]  The federal statute that implements the ICSID Convention, 22 U.S.C. § 1650a, does not
provide a separate basis of jurisdiction.  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of
Venezuela*, 863 F.3d 96, 112 (2d Cir. 2017); *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 44
(D.D.C. 2015) (ICSID awards must be enforced by plenary action in accordance with the FSIA).

to require a party to submit to arbitration." *Nat'l R.R. Passenger Corp. v. B&M Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) (quoting *Bhd. of Teamsters Loc. No. 70 v. Interstate Distrib. Co.*, 832 F.2d 507, 832 (9th Cir. 1987)); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) ("the court determines whether a valid arbitration agreement exists").

### 1.    Under EU law, there was no agreement to arbitrate.

As an initial matter, the ECT is not an arbitration agreement.  In this respect, investment treaties are distinct from more-common arbitration clauses in commercial agreements.  Unlike such contracts, the investor is not a party to the treaty.  Rather, investment treaties that provide for arbitration contain a standing offer by states to arbitrate disputes that investors can later accept when a dispute arises.  See *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 n.3 (D.C. Cir. 2015) (explaining that the bilateral investment treaty between the United States and Ecuador is not an ordinary contract between private parties, but rather "includes a standing offer to all potential U.S. investors to arbitrate investment disputes, which [the claimant] accepted in the manner required by the treaty").

There was no agreement to arbitrate because EU law precludes Spain from making an offer to arbitrate matters that may require the interpretation or application of EU law where, as here, the putative claimants are nationals of EU Member States.  Under *Achmea*, if the ECT is a treaty by which Member States would "remove from the jurisdiction of their own courts . . . disputes which may concern the application or interpretation of EU law," *Achmea* ¶ 55, then a Member State's putative offer to submit to arbitration under that treaty is void *ab initio*. Hindelang Decl. ¶ 39.  The Member States cannot make offers to arbitrate claims against nationals of other Member States; they lost that ability when they acceded to the EU.

Furthermore, *Achmea*'s reasoning applies to any "international agreement concluded between Member States." *Achmea* ¶ 57.  The fact that the ECT is a multilateral treaty and not a

bilateral treaty between two EU Member States is immaterial.  Just a year after *Achmea*, the

Court of Justice applied the same reasoning to a multilateral trade treaty.  *See* Hindelang Decl.

¶¶ 45, 56.  And just last fall, one of the Advocate Generals of the EU Court of Justice issued an

opinion in which he confirmed that the dispute-resolution provision of the ECT is inapplicable to

disputes between a Member State and nationals of another Member State:

> In the light of [*Achmea*], it seems to me that, inasmuch as Article 26
> of the Energy Charter, which is headed "Settlement of disputes
> between an investor and a Contracting Party," provides that such
> disputes may be resolved by arbitral tribunals, ***that provision is not***
> ***applicable to intra-Community disputes***.  In my view it may even
> be the case, having regard to the observations made by the Court in
> that judgment—especially in relation to the particular nature of the
> law established by the Treaties and the principle of mutual trust
> between the Member States—that the Energy Charter is entirely
> inapplicable to such disputes.

Opinion of Advocate General Saugmandsgaard Øe, *Anie*, CJEU Case Nos. C-798/18 & C-799/18

¶ 93 n.55 (Hindelang Decl. Ex. 67) (emphasis added).  These decisions are not a surprise.  As

Prof. Hindelang opines, they are a "direct consequence of the foundational legal order in the

European Union."  Hindelang Decl. ¶ 23.

     In this case, it is undisputed that the ECT removes disputes from the jurisdiction of EU

courts; that is the very nature of arbitral process.  It is undisputed that the Tribunal understood

itself to be adjudicating a dispute between one Member State and nationals of another.  And it is

undisputed that the Tribunal was called upon to resolve "disputes which may concern the

application or interpretation of EU law."  *Achmea* ¶ 55.  The ICSID Convention requires

tribunals to "decide a dispute in accordance with such rules of law as may be agreed by the

parties."  ICSID Convention, Art. 42(1).  Under the ECT, the contracting parties agreed that an

arbitral tribunal is bound to decide the dispute in accordance with the ECT "and applicable rules

and principles of international law."  ECT, Art. 26(6).  The EU Treaties are international law. Hindelang Decl. ¶¶ 62.

## 2.   The EU's interpretation of its own law is binding on the Court.

The views of the EU Court of Justice, the European Union and its Members States, and the European Commission on matters of EU law and the ECT are binding rules of decision on this Court.

*First*, the EU Court of Justice has final authority to interpret EU law.  Under EU law, the Court of Justice has the authority to determine the scope of Member States' ability to enter into arbitration agreements.[5]  The Court of Justice has exercised its authority under the EU Treaties to declare incompatible with EU law—i.e., unconstitutional—arbitration provisions in international agreements like the ECT.  The Court must follow that decision.  *Al Tech Specialty Steel Corp. v. United States*, 28 Ct. Int'l Trade 1468, 1503 (C.I.T. 2004) (affording conclusive weight on the issue of EU law to a decision of the EU Court of Justice); *see also Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (analogizing the process of determining foreign law to the rules for ascertaining state law, and observing that the decisions of a state's highest court are "binding on the federal courts" in deciding the content of state law).

*Second*, the Court must give deference to the interpretation of the ECT reached by the European Union and its Member States.  Where parties to a treaty "agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [a court] must, absent extraordinarily strong contrary evidence, defer to that interpretation."  *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *see also Medellin v. Texas*, 552 U.S. 491, 507

---

[5]  That should not be surprising.  The U.S. Constitution contains similar restrictions limiting the validity of agreements between states:  "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State[.]"  U.S. Const., art. I, § 10, cl. 3.

(2008) ("'postratification understanding' of signatory nations" to a treaty aids its interpretation); *Air France v. Saks*, 470 U.S. 392, 404 (1985) ("we find the opinions of our sister signatories to be entitled to considerable weight" in interpreting treaties).  Such deference is particularly compelling where, as here, the United States is not a party to the treaty at issue.

The European Union, which is a party to the applicable treaty, has explained that "the interpretation of Article 267 and 344 of the TFEU adopted in *Achmea* applies to intra-EU investor-State arbitration under the ECT[.]"  Proposed Amicus Brief of the European Union (Hindelang Decl. Ex. 50) at 13.  Thus, "any offer of intra-EU arbitration contained in the ECT is . . . ineffective and cannot have given rise to a valid arbitration agreement[.]"  *Id.* at 14.  That view is echoed by the joint declaration of twenty-two EU Member States, which explained that an "arbitral tribunal established on the basis of investor-State arbitration clauses" in investment treaties between and among EU Member States "lacks jurisdiction, due to a lack of a valid offer to arbitrate."  Hindelang Decl. Ex. 6 at 1; *see also id.* n.2 (expressly referencing the Energy Charter Treaty).  The European Commission shares this view, explaining that claims against Member States cannot be heard by "arbitration tribunals established . . . under the Energy Charter Treaty."  *Communication from the Commission to the European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547 (July 19, 2018) 26 (Hindelang Decl. Ex. 49).

*     *     *

The fact that there was no agreement to arbitrate—and that the Award is therefore unenforceable—should come as no surprise to Plaintiffs.  When they chose arbitration under the ECT in 2015, Plaintiffs were on notice of these jurisdictional risks.  Member States and the European Commission had publicly objected to the validity of such arbitration provisions since

19

at least 2006.  The EU Court of Justice's 2018 decision in *Achmea* merely confirmed that they had been right all along.  Plaintiffs' choice of arbitration was motivated, no doubt, by hopes of avoiding such jurisdictional objections—and in that regard, it was unsurprisingly successful. Arbitral tribunals routinely deny challenges to their own jurisdiction.[6]  In this case, the Tribunal saw itself as the organ of an independent legal order, denying the request of the European Commission to submit briefs on matters of EU law, taking the ECT as its "constitutive reality," and considering itself bound by "the ECT and no other legal instrument."  Award ¶ 257.  That was, of course, a mistake:  Tribunals derive their power exclusively from the agreement of the parties.  And the decision of an arbitral tribunal constituted without such agreement has no legal effect.  Plaintiffs' forum shopping has now left them without an enforceable award.  But that is their burden.  Plaintiffs could have pursued their claims against Spain in any of the EU courts, *see* Hindelang Decl. ¶¶ 49–50, just as EU law requires.

### B.      The "Waiver Exception" in Section 1605(a)(1) Does Not Apply.

Plaintiffs also argue that Spain is not entitled to immunity from this Court's jurisdiction because it "waived its immunity. . . by becoming a party to the ICSID Convention."  Compl. ¶ 8. Section 1605(a)(1) provides that "[a] foreign state shall not be immune" when "the foreign state has waived its immunity either explicitly or by implication[.]"  Spain did not waive its immunity, either explicitly or impliedly.

*First*, Spain did not expressly waive immunity.  "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."  *World Wide Minerals, LTD v. Republic of*

---

[6]  Perhaps because, as Prof. Hindelang observes, "intra-EU investment arbitration accounts for roughly twenty percent" of the market, "which would instantly disappear if the intra-EU objection is accepted."  Hindelang Decl. ¶ 21 n.9.

*Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002).  The Complaint does not attempt to identify any text in the Convention that would effect an explicit waiver—and there is none.  To the contrary, the Convention expressly preserves the signatories' sovereign immunity.

The Convention addresses the role of domestic courts in Chapter IV, Section 6, entitled "Recognition and Enforcement of the Award."  Article 54 provides that each signatory "shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award . . . as if it were a final judgment[.]"  But the Convention quickly clarifies that "[n]othing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or any foreign State from execution."  ICSID Convention, Art. 55; *see also* Christoph Schreuer, *The ICSID Convention*, 1154 (2d ed. 2009) (the Convention does nothing to displace domestic "law governing the immunity from execution of judgments and arbitral awards").

*Second*, Spain did not impliedly waive immunity.  The D.C. Circuit has observed that "[t]he FSIA does not define 'implied waiver'" and instructs that the implied waiver provision must therefore be construed "narrowly."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).  In particular, the D.C. Circuit has held that an implied waiver requires that "the foreign state . . . intended to waive its sovereign immunity."  *Id.*  Circumstances for implied waiver are few.  The D.C. Circuit has recognized only three: where "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity."  *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).

21

The second and third circumstances do not apply; there is no contract, and Spain has raised the defense of sovereign immunity in this pleading.  Instead, Plaintiffs appear to argue that Spain's accession to the ICSID Convention constitutes an agreement to arbitrate.  That argument fails at the outset—ratification of the Convention does not constitute a general agreement to arbitrate claims.  As the preamble to the Convention declares, "no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration[.]"  Nor was there any agreement to arbitrate Plaintiffs' claims in particular.  *See* Part I.A, *supra*.  A state cannot be said to have waived immunity to the enforcement of an award arising out of a claim it did not agree to arbitrate.  A contrary outcome would be illogical.

The Complaint cites *Tatneft v. Ukraine*, 771 Fed. App'x 9 (D.C. Cir. 2018), ostensibly in support of its implied-waiver argument.  Compl. ¶ 8 n.1.  In that case, the D.C. Circuit held that Ukraine waived its immunity by agreeing to arbitrate claims under the New York Convention, "a treaty in which signatories agree to enforce arbitral awards made in other signatory countries." *Tatneft*, 771 Fed. App'x at 9.  That holding was sufficiently unremarkable that the D.C. Circuit disposed of the *Tatneft* appeal in an unpublished opinion, seeing "no precedential value in that disposition."  D.C. Cir. R. 36(e).  In any event, *Tatneft* is unavailing as applied to the facts of this case because it begins with the fundamental premise that there was a valid agreement to arbitrate. Ukraine never argued that the bilateral investment treaty at issue was invalid or that its offer to arbitrate could not be accepted (as Spain does here).  Rather, Ukraine argued instead that the tribunal's award was "not made 'pursuant to'" that agreement because the tribunal exceeded its power in awarded damages on theories of recovery that were not cognizable under the treaty. *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 187 (D.D.C. 2018) (arguing that the claimant's a "fair

and equitable treatment" claim and request for damages on behalf of parent investors were *ultra vires*).  This case thus diverges from *Tatneft* at the first step:  There was no valid agreement to arbitrate.

Tatneft also involved a dispute "governed by the New York Convention[,]" not the ICSID Convention.  *Id.* at 187.  The New York Convention applies in the United States only to "commercial" disputes and is codified in the Federal Arbitration Act ("FAA").  9 U.S.C. § 202.  As Plaintiffs observe, *see* Compl. ¶ 14, the FAA does "not apply to enforcement of awards rendered pursuant to the [ICSID] convention."  22 U.S.C. § 1650a(a).  The ICSID Convention is a separate regime that expressly preserves sovereign immunity; it does nothing to waive those protections.  *See* ICSID Convention, Art. 55.  As the State Department advised when Congress implemented the ICSID Convention, "there is nothing in the convention that will change the defense of sovereign immunity."  H.R. 15785 Hearing at 18 (statement of Andreas F. Lowenfeld, Deputy Legal Advisor, Dep't of State).  Because Spain did not agree to arbitrate Plaintiffs' claims, there can be no waiver of its sovereign immunity.[7]

## II.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE.

Under the foreign sovereign compulsion doctrine, a U.S. court should refrain from entering an order that would compel a party to act in contravention of the laws of a foreign sovereign.  The D.C. Circuit instructs that "[p]rinciples of international comity require that domestic courts not take action that may cause the violation of another nation's laws."  *F.T.C. v.*

---

[7]  Unless the Court separately dismisses the Complaint under the doctrine of *forum non conveniens*, *see* Part V *infra*, the Court must resolve the question of subject-matter jurisdiction before considering the merits of Plaintiffs' case.  That is because the Court "must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible."  *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  "[T]o defer the question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'"  *Id.*  Importantly, Spain has the "right to take an immediate appeal" for denial of immunity under the collateral-order doctrine. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (collecting cases).

*Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n.150 (D.C. Cir. 1980); *see also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders."). The doctrine thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries." Restatement of the Foreign Relations Law of the United States 3d § 441 (1987), reporters' notes 1.

The EU is a sovereign entity; it makes law and issues judgments to which Spain is subject. Ordering Spain to comply with the Award would violate EU law in two ways: *First*, *Achmea* holds that investment arbitration that may require the interpretation or application of EU law is incompatible with EU law. Ordering Spain to comply with the Award would require Spain to recognize and validate an arbitration that contravenes EU law. *Second*, ordering Spain to pay a judgment resulting from the Award would require Spain to make unlawful payments in violation of EU staid-aid law because the European Commission has not authorized its payment.

For purposes of this case, the Court is bound by the EU Court of Justice decision and the pronouncements of the European Commission. The acts of foreign sovereigns become "a principle of decision binding on federal and state courts alike." *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990). This is not a "vague doctrine of abstention." *Id.* The court may not "question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). The Complaint must therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6).

### III.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT.

Under the statute implementing the ICSID Convention, the Award only receives "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a); *Mar. Int'l Nominees Estab. v. Republic of Guinea*, 693 F.2d 1094, 1103 n.14 (D.C. Cir. 1982).  But not all state-court judgments are enforceable.  "[B]asic limitations on the full-faith-and-credit principles" require that "'the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.'" *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) (quoting *Durfee v. Duke*, 375 U.S. 106, 110 (1963)).  Thus, "where the rendering forum lacked jurisdiction over the subject matter or the parties, full faith and credit is not required." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 386 (1996).

As discussed above, the Tribunal lacked jurisdiction in two ways.  *First*, there was no valid agreement to arbitrate.  "[T]he first principle that underscores all of [the Supreme Court's] arbitration decisions" is that "[a]rbitration is strictly a matter of consent." *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010) (collecting authority for this "foundational" principle).  Absent agreement and consent of the parties, the Tribunal is powerless and without jurisdiction; its members are only three jurists expressing an unenforceable opinion on a dispute.

*Second*, the Tribunal's award of unlawful state aid exceeded its authority.  "[A]rbitrators wield only the authority they are given." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019).  "[T]hey derive their powers" from the particular terms of the parties' agreement. *Id.*; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010).  The Tribunal's jurisdictional mandate here was limited to "decid[ing] the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law." ECT, Art. 26(6).  As explained above, EU law forms part of those "applicable rules and principles of international

law," thereby excluding from the Tribunal's jurisdiction matters that may not be decided by arbitration under EU law.  Under EU law, the authorization of state aid is the exclusive province of the European Commission.  *See* TFEU, Arts. 107(1), 108(3).  Arbitral tribunals may not award state aid.  *Id.* at Arts. 108(2)–(3); State Aid Decision 2017/7384 ¶¶ 165, 166 (noting that this "[d]ecision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law.").  By trespassing on the European Commission's exclusive jurisdiction, the Tribunal rendered an *ultra vires* award that exceeds any jurisdiction it could have under Article 26 of the ECT.  The Award is therefore not entitled to full faith and credit.

## IV.   IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

The legal arguments above are dispositive of this case.  Settled EU law demands that this Court dismiss the Complaint.  But if there were any question about EU law and its application to this case, then the Court should dismiss under the doctrine of *forum non conveniens*.[8]

Courts may dismiss an action where "(1) there is an available and adequate alternative forum, and (2) the balance of various public and private interest factors indicates that maintaining the case in the current forum is comparatively inconvenient."  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 35 (D.D.C. 2018) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Both elements are readily established in this case.

*First*, the judicial system of the European Union provides adequate fora.  A "foreign forum is available and adequate when it provides the plaintiff with some remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized."  *In re Air Crash*, 352 F. Supp. 3d at 36

---

[8]  The Court may dismiss under *forum non conveniens* without first resolving questions of its jurisdiction.  *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

(citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 255 (1981)).  Under the ICSID

Convention, a claimant can seek enforcement of a valid award in any contracting state (subject to

available defenses, *see* Part IV *supra*).  Plaintiffs cannot dispute that Spain, Luxembourg, and

France are available for a (among others).  If the Award were enforceable, the ordinary place to

find Spanish assets is in Spain.  *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v.*

*Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011) ("Where adequacy of an alternative forum is

assessed in the context of a suit to obtain a judgment and ultimately execution on a defendant's

assets, the adequacy . . . depends on whether there are some assets of the defendant in the

alternate forum, not whether the precise asset located here can be executed upon there.").

     *Second*, the *Gulf Oil* factors favor dismissal.  "The public interest factors to consider are

the desirability of clearing foreign controversies from congested dockets, the extent of any local

interest in resolving the controversy, and the ease with which the present forum will be able to

apply the laws of an unfamiliar jurisdiction."  *Atl. Tele-Network v. Inter-Am. Dev. Bank*, 251 F.

Supp. 2d 126, 137 (D.D.C. 2003).  This District has nine pending actions against Spain alone, all

of which involve the enforcement of international arbitral awards.  Another twenty-two

arbitrations involving nationals of EU Member States are pending before ICSID tribunals,[9] cases

which will surely find their way to this District if it offers a divergent—and more favorable—

interpretation of EU law.[10]  The United States has no interest in resolving matters of EU law,

particularly as applied to a treaty to which the United States is not a party.

---

[9]  *See* ICSID Case Database, *available at* https://icsid.worldbank.org/en/Pages/cases/Advanced
Search.aspx

[10]  *See, e.g.*, *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 36
(D.D.C. 2019) (expressing reservations in "resolving a thorny dispute over the implications of
multiple treaty obligations and a shifting legal landscape in the European Union" and noting that
"considerations of comity are particularly resonant here, given that resolving this case mandates
addressing a conflict between decades-old treaties and newly minted EU case law").

Indeed, Plaintiffs have flocked to this District in hopes of evading the straightforward application of EU law.  If they prevail, they will create a conflict between the U.S. courts and the EU Court of Justice on matters of EU law.  That is precisely the kind of conflict that principles of international comity instruct courts to avoid.  *Nygard v. DiPaolo*, 753 F. App'x 716, 728 (11th Cir. 2018) ("[T]he possibility of inconsistent rulings with foreign countries raises international comity concerns that should be considered in the forum non conveniens analysis.").  Plaintiffs' choice of forum is entitled to little deference when the dispute has no connection to the forum. *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 605 (D.C. Cir. 1983); *Irwin v. WWF, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006).  Plaintiffs' choice of forum should be viewed with even more skepticism when it is predicated on a patent interest in avoiding the application of foreign law in the proper forum.  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) ("the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference [it] commands").

Consistent with that view, other courts have dismissed actions against foreign sovereigns under the doctrine.  *See In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002) (affirming the district court's dismissal of an enforcement action against a Ukrainian state-owned company for *forum non conveniens* where the litigation had no connection to the United States); *Figueiredo Ferraz e Enghenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) (reversing the district court and ordering dismissal for *forum non conveniens* of an enforcement action where a Peruvian judgment-cap statute had a direct impact on Peru's ability to pay an arbitral award).

The D.C. Circuit imposes one limited restriction on the *forum non conveniens* doctrine in the context of the FSIA, which does not apply to the circumstances here.  In *TMR Energy Ltd. v.*

*State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), the petitioner sought to render an arbitral award into a domestic judgment in order to attach property that Ukraine's instrumentality in the United States.  *Id.* at 303.  The court held that dismissal under *forum non conveniens* was improper because a "court of the United States" is the only available forum for an action to "attach the commercial property of a foreign nation located in the United States."  *Id.*[11]

This case presents a different issue.  *TMR Energy* addressed a later stage of the enforcement proceedings, where the live issue was which fora were available for attached commercial assets within the United States.  That only occurs after the court's jurisdiction had been established—notably, the respondent in that case *did* "*not dispute* that [the] case [came] within . . . the exception to immunity for any action brought to confirm an arbitration award" under Section 1605(a)(6) of the FSIA.  *TMR Energy*, 411 F.3d at 324 (emphasis added).  By contrast, Spain vigorously contests the Court's jurisdiction.  The Court's jurisdiction must be resolved as a threshold matter—and thus well before the issue of attachment and enforcement in *TMR Energy* become relevant.  The District of Columbia is an inconvenient forum to resolve the predicate question to attachment:  whether Plaintiffs can establish a valid arbitration agreement to deprive Spain of its sovereign immunity.  Resolution of that question is not proper in this forum because of the complicated issues of European Union and international law, none of which was present in *TMR Energy*.  At a theoretical later stage, Spain agrees the United States is the only jurisdiction in which to execute a judgment against assets in the United States.[12]

---

[11]  *See also BCB Holdings Ltd. v. Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) ("In *TMR* . . . we held that . . . *forum non conveniens* does not apply to actions in the [U.S] to enforce arbitral awards against foreign nations."); *Newco Ltd. v. Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016).

[12]  Spain notes, however, that the location of such assets does not make the United States the *only* available forum for Plaintiffs' enforcement action.  "[I]t is well established that the availability and the adequacy of a forum does not turn on whether exactly the same remedy that exists in the United States is available in the foreign forum."  *Southern Indian Ocean*, 352 F. Supp. 3d at 38.  A foreign forum need only provide the plaintiff "with *some* remedy, even if the damages

Any broader reading of *TMR Energy* would render *forum non conveniens* functionally inapplicable to any case that falls under the enforcement provisions of the FSIA.  But that cannot be the case.  As the D.C. Circuit explains: "the doctrine of *forum non conveniens* remains fully applicable in FSIA cases."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 100 (D.C. Cir. 2002); *Simon v. Republic of Hungary*, 911 F.3d 1172, 1182 (D.C. Cir. 2018).

## V.    IN THE ALTERNATIVE, THE CASE SHOULD BE STAYED PENDING RESOLUTION OF THE ANNULMENT PROCEEDINGS.

In all events, the Court should not grant Plaintiffs any relief under the Complaint until Spain's application for annulment is resolved.  The Court may issue a stay under its inherent authority to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  In considering a motion to stay, the Court should "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (internal quotation marks omitted).  All factors support a stay in this case.

*First*, the *ad hoc* Committee is empowered to annul the entirety of the Award, and Spain has requested that relief.  ICSID Convention, Art. 52(3).  The Court should not enforce an award when challenges to its validity have not yet been resolved.  *Second*, a stay prevents duplicative litigation in multiple fora and avoids the possibility of conflicting results between this Court's determination and the *ad hoc* Committee's annulment decision.  *Third*, the balance of hardships also weighs in favor of a stay.  No injury will result to Plaintiffs; in the event the Award were eventually enforced, Plaintiffs will have continued to accrue interest on the Award through the

---

available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized."  *Id.* at 37.

date of payment.  Compl. ¶ 25(iii).  Denying a stay and granting relief under the Complaint, by
contrast, would compel Spain to violate EU law.

Several other petitioners have initiated actions in this District, seeking to enforce arbitral
awards issued under the ECT against the Kingdom of Spain.  None of the judges has granted the
petitions.  Every court to enter an order has instead stayed the action pending resolution of the
parallel annulment proceedings.  *See Masdar Solar & Wind Cooperatief U.A. v. Spain*, 397 F.
Supp. 3d 34, 36 (D.D.C. 2019) ("it is wiser . . . stay these proceedings pending the opinion of the
ICSID regarding Spain's petition to annul"); *NextEra Energy Glob. Holdings B.V. v. Spain*, Civ.
No. 19- 1618 (TSC), 2020 WL 5816238, at *1 (D.D.C. Sept. 30, 2020) (agreeing with *Masdar*);
*9REN Holding S.A.R.L. v. Spain*, Civ. No. 19-1871 (TSC), 2020 WL 5816012, at *1 (D.D.C.
Sept. 30, 2020) (same); *Infrastructure Servs. Luxembourg S.a.r.l. et al. v. Spain*, Civ. No. 18-
1753 (EGS), ECF No. 36 (Aug. 28, 2019); *Novenergia II – Energy & Environment (SCA) v.
Spain*, Civ. No. 18-1148 (TSC), ECF No. 43 at 1 (Jan. 27, 2020); *Eiser Infrastructure Limited et
al. v. Spain*, Civ. No. 18-1686 (CKK), ECF No. 51 (Feb. 13, 2020) (same).

## CONCLUSION

For these reasons, Spain respectfully requests the Court enter an order dismissing the
Complaint for lack of subject-matter jurisdiction; dismissing the Complaint under the doctrine of
*forum non conveniens*; denying Plaintiffs' claims on the merits under either the foreign sovereign
compulsion doctrine or the full-faith-and-credit requirement; or, at a minimum, staying the
proceedings until Spain's application for annulment is resolved.

Dated:  February 12, 2021                               Respectfully submitted,

                                                          /s/ Ana C. Reyes
                                                        Ana C. Reyes (D.C. Bar No. 477354)

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:      (202) 434-5000
Fax:      (202) 434-5029
Email:    areyes@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2021, I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants.

_/s/ Ana C. Reyes_
Ana C. Reyes